**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BRYAN RIDDLE,<br><br>              Plaintiff,<br><br>      v.<br><br>CITY OF CHICAGO, OFFICER RAYMOND ARCE (#9519), OFFICER NICHOLAS ESTRADA (#13074), OFFICER BRIAN GLUECKLICH (#17611), OFFICER JOANNA JARZABEK (#7420), OFFICER ANDREW PANG (#13153), OFFICER JHONATHAN PEREZ (#13162), OFFICER EDWARD SPIZZIRRI (#13381), SERGEANT SCHULTZ, and OFFICERS J. DOES 1-5,<br><br>              Defendants. | Case No. 1:21-cv-1588<br><br><br>JURY TRIAL DEMANDED |

**<u>COMPLAINT</u>**

Plaintiff Bryan Riddle, by and through his undersigned attorneys, and pursuant to this Complaint, alleges the following against Defendants City of Chicago, and City of Chicago Police Officers Arce, Estrada, Gluecklich, Jarzabek, Pang, Perez, Spizzirri, Sergeant Schultz, and Officers J. Does 1-5 (collectively, "Defendant Officers"):

**<u>INTRODUCTION</u>**

1.      This is a civil action brought pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, to redress the deprivation of Plaintiff's rights secured by the United States Constitution.

**<u>JURISDICTION AND VENUE</u>**

2.      This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

3.      This Court has supplemental jurisdiction over Riddle's state law claims pursuant to 28 U.S.C. § 1367(a).

4.      Venue is proper under 28 U.S.C. § 1391(b), as all defendants are residents of the

State of Illinois and a substantial part of the events giving rise to these claims occurred in this judicial district.

## PARTIES

5.       Plaintiff Bryan Riddle ("Plaintiff" or "Riddle") is a resident of Cook County, Illinois.  He is a thirty-three-year-old Black man.

6.       Defendant City of Chicago ("City of Chicago" or "City") is an Illinois municipal corporation that maintains a police department, commonly referred to as the Chicago Police Department ("CPD" or "Department"), as a division of its municipal corporation at all relevant times.

7.       At all relevant times, the City of Chicago exercised control over CPD and CPD was the sole police department of the City of Chicago.

8.       At all relevant times, the City of Chicago was responsible for the policies and practices of CPD.  These policies and practices include, but are not limited to, policies and practices related to training officers on the use of reasonable force and the duty to intervene to prevent excessive force.

9.       At all relevant times, the City of Chicago is or was the employer of the individual police officers named as Defendants herein.

10.       Defendant Officer Raymond Arce ("Arce") is an individual who was at all times relevant to this Complaint a police officer with the City of Chicago (#9519).

11.       Defendant Officer Nicholas Estrada ("Estrada") is an individual who was at all times relevant to this Complaint a police officer with the City of Chicago (#13074).

12.       Defendant Officer Brian Gluecklich ("Gluecklich") is an individual who was at all times relevant to this Complaint a police officer with the City of Chicago (#17611).

13.     Defendant Officer Joanna Jarzabek ("Jarzabek") is an individual who was at all times relevant to this Complaint a police officer with the City of Chicago (#7420).

14.     Defendant Officer Andrew Pang ("Pang") is an individual who was at all times relevant to this Complaint a police officer with the City of Chicago (#13153).

15.     Defendant Officer Jhonathan Perez ("Perez") is an individual who was at all times relevant to this Complaint a police officer with the City of Chicago (#13162).

16.     Defendant Officer Edward Spizzirri ("Spizzirri") is an individual who was at all times relevant to this Complaint a police officer with the City of Chicago (#13381).

17.     Defendant Officer Sergeant Schultz ("Schultz") is an individual who was at all times relevant to this Complaint a police officer with the City of Chicago (unknown badge number).

18.     Defendant Officers J. Does 1-5 ("Unknown Officers") are individuals who were at all times relevant to this Complaint police officers with the City of Chicago.

19.     This action is brought against Defendant Officers in their individual capacities.

20.     When Defendant Officers engaged in the conduct alleged in this Complaint, they were acting in the course and scope of their employment as CPD officers, while on duty, and as agents of the City of Chicago.

21.     At all times relevant to this Complaint, Defendant Officers were acting under color of state law, statute, ordinance, regulation, custom, and/or usage of the City of Chicago.

## FACTUAL BACKGROUND

### Defendant Officers Stopped Riddle
### Without Probable Cause That He Committed a Traffic Violation

22.     Riddle worked as a delivery driver for goPuff, an instant delivery service that allows customers to have essential items—everything from food and drinks to cleaning supplies—

3

delivered directly to their door 24/7.

23.     Early in the morning of September 2, 2019, Riddle left the goPuff warehouse located at 1345 S. Ashland Avenue in Chicago, IL to make deliveries to customers.

24.     While driving south on S. Ashland Avenue in the rightmost lane, Riddle passed under the overpasses between 15th St. and 16th St. and saw a CPD squad car driving toward him, northbound, on S. Ashland Avenue.

25.     As Riddle approached the intersection of 18th St. and S. Ashland Avenue, the CPD squad car made a U-turn, activated its lights, and pulled behind Riddle's car.

26.     Riddle pulled over, stopped his car on the side of the road, and waited inside his car for further instruction.

27.     Officer Arce approached the passenger's side of Riddle's car while Officer Estrada approached the driver's side.

28.     Officer Estrada told Riddle that he failed to use a turn signal to turn.

29.     Riddle told Officer Estrada that he never turned.

30.     Officer Estrada then said that Riddle failed to use a turn signal to change lanes.

31.     This second explanation also did not make sense because Riddle had stayed in the rightmost lane of S. Ashland Avenue the entire time he was in view of Officers Arce and Estrada—Riddle did not change lanes, make a right- or left-hand turn, or otherwise allow his car to drift in any direction.

**Defendant Officers Yanked Riddle Out of the Car,
Shoved Him to the Ground, and Applied Successive Carotid Artery Holds**

32.     After Officer Estrada changed explanations about the purported reason for the stop, Officer Arce suddenly opened Riddle's front passenger door and told Officer Estrada: "Pull him out."

33.     Riddle, fearful of what might happen if he got out of his car, asked Defendant Officers to call a sergeant.

34.     Officer Arce began searching Riddle's front passenger seat with a flashlight.

35.     When Riddle demanded to know why Officer Arce was searching his car, Officer Arce responded that he wanted Riddle to get out of the car.

36.     Riddle responded that there was no reason for him to get out of the car, and then Riddle handed Officer Estrada his driver's license and insurance.

37.     Officer Estrada placed Riddle's driver's license and insurance on the roof of the car without looking at them.

38.     Officers Arce and Estrada continued to ask Riddle to get out of the car and Riddle repeatedly asked Defendant Officers to call a sergeant.

39.     Officer Arce asked Riddle if he had weed in the car.  Riddle said he did not.  Officer Arce asked again and insisted:  "It's not a big deal if it's weed."  Riddle reiterated that there was no weed in his car.

40.     Officer Estrada thrust his arm into the car and across Riddle's body, unbuckled Riddle's seat belt, and grabbed Riddle's right wrist, telling Riddle:  "Listen man, it's gonna be the easy way or it's gonna be the hard way."  Shortly thereafter, Officer Arce relocated to the driver's side of Riddle's car and began helping Officer Estrada pull Riddle's arms in an attempt to get him out of the car.

41.     At various unknown times, but while Riddle remained in his car, other Defendant Officers arrived on the scene.

42.     Officer Perez arrived on the scene and joined several Defendant Officers at the driver's side of Riddle's car.  Officer Perez immediately escalated the situation by working with

Officers Arce and Estrada to yank Riddle from the car.

43.     Fearing for his safety, Riddle continued insisting that Defendant Officers call a sergeant.

44.     Defendant Officers, including at least Officers Arce, Estrada, Pang, and Perez, shoved Riddle to the ground, causing Riddle's head to slam against the pavement with such force that his head began throbbing and he experienced a dreamlike state of confusion and disorientation.

45.     As soon as Riddle was on the ground, Officers Estrada and Perez applied a carotid restraint to Riddle's neck, nearly rendering Riddle unconscious.

46.     At various unknown times, but while Riddle was on the ground, other Defendant Officers arrived on the scene.

47.     During the time that Officers Estrada and Perez had Riddle's neck pinned to the pavement in a carotid restraint, Officer Arce put handcuffs on Riddle's left wrist.  Even though it was obvious that Officers Estrada and Perez had incapacitated Riddle at that time, Officer Arce made no attempt to move Riddle's right arm into a position to complete the handcuffing process. Instead, Officer Estrada grabbed Riddle's left arm and aggressively pulled Riddle's left arm backwards, pinning it against his (Officer Estrada's) waist.

48.     While Defendant Officers held Riddle to the ground, Sergeant Schultz arrived on the scene, approached the huddle of Defendant Officers and proceeded to apply multiple carotid artery holds to Riddle.  Specifically, Sergeant Schultz helped Officers Arce, Estrada, and Perez twist and contort Riddle's body so that the right side of Riddle's body was pinned to the ground.

49.     Sergeant Schultz and Officers Arce, Estrada, and Perez then bent Riddle's neck and head so far inward that Riddle's mouth was inches from his right thigh.

50.     While Officer Perez was holding Riddle's head to the pavement, Sergeant Schultz

used his arm and hand to choke Riddle. Sergeant Schultz then kneeled on Riddle's neck.

51. For almost one minute, Defendant Officers stood by and watched as Sergeant Shultz kneel on Riddle's neck and Riddle screamed.

52. In conformity with CPD's "code of silence," which is described in greater specificity below, Defendant Officers did not intervene to stop the use of excessive force they each witnessed:

    a.    Officer Gluecklich, who watched as Defendant Officers pinned Riddle to the ground and prolonged the handcuffing process, laughed at Riddle's cries and did nothing to intervene.

    b.    Officer Jarzabek, who was on the scene when Defendant Officers yanked Riddle from his car and who witnessed both Officer Estrada's and Officer Perez's initial carotid restraint (after Riddle's head slammed into the pavement) and Sergeant Schultz's carotid restraint and knee-to-neck force, deliberately walked away from the Defendant Officers battering Riddle after Riddle began screaming.

    c.    Officer Pang, who participated in the initial takedown of Riddle and watched as Defendant Officers pinned Riddle to the ground, and who facilitated Sergeant Schultz's nearly one-minute knee-to-neck use of force, did nothing to intervene.

    d.    Officer Perez mocked Riddle as he screamed in pain under the weight of Sergeant Schultz's knee, saying, "Yeah, yeah, yeah. Yeah, yeah. Now you wanna scream? Now you wanna scream? Now you wanna scream?" and did nothing to intervene.

    e.    Officer Spizzirri, who approached Officers Arce, Estrada, Gluecklich, and Pang, and Sergeant Schultz, when he heard Riddle screaming, watched as Defendant Officers pinned Riddle to the ground and as Sergeant Schultz applied the nearly one-minute knee-to-neck use of force and did nothing to intervene.

53. When Riddle was on the ground and Defendant Officers were using excessive force on him, Riddle did not actively resist Defendant Officers.

54. After Defendant Officers handcuffed his right wrist, Riddle pleaded with them that he could not breathe.

55. Officers Gluecklich and Pang sat Riddle upright and left him seated on the ground for nearly forty-five seconds before standing Riddle up to search Riddle's person.

56.    At no point during the events described in this Complaint did any Defendant Officer ask Riddle if he had any weapons.

57.    At no point during the events described in this Complaint did Riddle harm any Defendant Officer.

58.    At no point during the events described in this Complaint did Riddle threaten to harm any Defendant Officer.

59.    At no point during the events described in this Complaint did Riddle flee or attempt to flee.

60.    At no point during their use of excessive force did Defendant Officers suspect Riddle of a serious crime.

61.    Defendant Officers caused significant damage to Riddle's car during the course of their search:  Defendant Officers broke various compartments inside the car, ripped out the lining in the wheel well, tore down the carpet lining, and generally destroyed the interior of the car.

62.    Defendant Officers did not recover any weapons from Riddle's person or car.

### Defendant Officers Exacerbated Riddle's Pain and Humiliated Riddle by Dragging Him Across the Ground in the 12th District Police Station

63.    After Riddle's arrest, Sergeant Schultz transported him to the 12th District Chicago Police Station.

64.    Riddle, who was bloodied and in excruciating pain from the injuries inflicted by Officers Arce, Estrada, Pang, and Perez, and Sergeant Schultz, asked for medical attention at the station.

65.    While at the station, Riddle complained to the Unknown Officers (upon information and belief, including some of the previously named Defendant Officers) that his handcuffs were too tight and injuring his wrists, but the Unknown Officers did not loosen Riddle's handcuffs.

66.     Instead, an EMT arrived and, along with the Unknown Officers, mocked Riddle's condition and laughed at his injuries.

67.     In the course of transporting Riddle from the station to an ambulance, the Unknown Officers refused Riddle's request for a wheelchair and dragged Riddle across the ground by his arms, which tightened his already excessively tight handcuffs, humiliated him, and exacerbated his injuries.

68.     Riddle was eventually taken to the hospital.

69.     After being treated at the hospital, Riddle was taken to the 1st District Police Station, where he was processed and booked.

70.     Upon information and belief, later that day, Riddle again received medical attention at a different hospital due to his severe injuries.

71.     Criminal charges were brought against Riddle for felony possession of a controlled substance, misdemeanor possession of ammunition without a Firearm Owners Identification ("FOID") card, and misdemeanor resisting arrest via criminal complaints sworn by Officer Estrada and also signed variously by Officers Arce and Pang.

72.     Riddle was eventually released on a $5,000 bond with restrictions on his release.

73.     On October 3, 2019, the court dismissed the criminal charges for felony possession of a controlled substance via *nolle prosequi*.

74.     On September 22, 2020, the court struck the misdemeanor charges for possession of ammunition without a valid FOID card and resisting arrest with leave to reinstate.

75.     On March 22, 2021, the reinstatement period expired. Therefore, as of March 22, 2021, all charges against Riddle have been dismissed.

76.     As a result of the traffic stop that led to his arrest, Riddle has had multiple court

dates requiring him to miss work and causing him to lose wages.

77. As a result of Defendant Officers' actions, Riddle feared having another traumatizing encounter with CPD officers. To avoid a repeat incident, Riddle rearranged his work schedule to avoid working late at night, which caused him to lose wages because working late at night is the most lucrative shift at goPuff.

78. As a result of Defendant Officers' actions, Riddle has experienced lasting pain and suffering, emotional trauma, mental anguish, and other consequences impacting his life.

79. As a result of Defendant Officers' destructive search of his car, Riddle's car remains extensively damaged.

**The City of Chicago and CPD's Failure to Train on Reasonable Use of Force**

80. In a January 13, 2017 report by the Department of Justice ("DOJ") summarizing its findings of a year-long investigation of the CPD ("DOJ Report"), the DOJ concluded that CPD "engages in a pattern or practice of unconstitutional use of force."

81. The DOJ Report explains that this pattern of unlawful conduct stems from the fact that CPD officers "do not receive the quality or quantity of training" necessary to make proper decisions regarding the degree of force that is appropriate in any given situation. As the DOJ Report observed, "CPD has not provided officers with adequate guidance to understand how and when they may use force, or how to safely and effectively control and resolve encounters to reduce the need to use force."

82. The DOJ Report notes that one Chicago Police Academy training on use of force "consisted of a video made decades ago, which was inconsistent with both current law and CPD's own policies." The impact of this woefully inadequate training was apparent when an interview of graduates from the Chicago Police Academy revealed that "only one in six [graduates] … came

close to properly articulating the legal standard for use of force."

83.    The City of Chicago and CPD fail to provide adequate continuing training on the use of force.  According to the DOJ Report, a review of hundreds of use of force incidents by CPD "revealed CPD officers engaging in dangerous tactics that indicate they do not remember or were never taught basic police skills" governing the use of force.  This "lack of continuing training has a direct connection to the improper use of force in patrol and other field assignments."

84.    The City of Chicago and CPD also fail to require officers to accurately report uses of force, which means there is no opportunity to meaningfully assess whether or how training should be modified to improve outcomes in the future.

85.    Changes to CPD use of force training initiated after the release of the DOJ Report have not addressed key deficiencies.  The training does not adequately explain the proper constitutional standard for determining if use of force is reasonable.  And it fails to provide any in-depth analysis or discussion of use of force "examples" from which officers could learn why certain uses of force are constitutional and others are not.

86.    Complaints of excessive force against CPD officers underscore the inadequacies in use of force training.  In the years following the release of the DOJ Report, members of the public have continued to file—at alarming rates—complaints of CPD officers using excessive force by shoving, pulling, punching, choking, and slamming citizens during the course of a stop or arrest.

87.    Further, even though de-escalation and force mitigation principles are purported to be key features of CPD's "revised" use of force policy, the new training "provide[s] minimal discussion of the reasons and tools for de-escalation and force mitigation," according to Chicago's Civilian Office of Police Accountability.  Indeed, the tone, rhetoric, and demeanor of the trainers charged with implementing CPD's new training module have given the impression that there is no

need to change CPD's culture around use of force incidents.

88.     The City of Chicago and CPD are and have been on notice of these ongoing deficiencies in use of force training.  As recently as June 2020, the independent monitor overseeing the federal consent decree to reform the CPD reported that the Department was not complying with its obligation to implement training that would ensure reasonable and constitutional use of force as called for by CPD policy.

89.     In his June 5, 2020 letter to the independent monitor commenting on the monitor's report, the Attorney General of Illinois concluded that "CPD continues to be reluctant to change its culture as it relates to use of force and to hold officers accountable for excessive force" and that the Department has not made "substantive changes to CPD policy … or training" in response to use of force incidents.

90.     This failure by the City to adequately train its officers on reasonable use of force despite knowledge that CPD officers engage in a pattern or practice of excessive force amounts to deliberate indifference to violations of constitutional rights.

### The City of Chicago and CPD's Failure to Discipline and Failure to Address the "Code of Silence"

91.     CPD teaches its officers not to violate the "code of silence."  Officers are instructed that "Blue is Blue.  You stick together.  If something occurs on the street that you don't think is proper, you go with the flow.  And after that situation, if you have an issue with that officer or what happened, you can confront them.  If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner.  But you never break the code of silence."

92.     The City of Chicago has known about and encouraged this code of silence in the CPD at all times relevant to this Complaint, and has not taken action to address it.

93.     For example, in 2012, in the case of *Obrycka v. City of Chicago*, No. 07-cv-2372 (N.D. Ill.), a federal jury found that the City of Chicago "had a widespread custom or practice of failing to adequately investigate and/or discipline its officers and/or of a police code of silence."

94.     The 2017 DOJ Report observed that both the City of Chicago and CPD were aware of the code of silence within CPD:

> a.     "Mayor [Rahm Emanuel] has acknowledged that a 'code of silence' exists in the CPD, and his opinion is shared by current officers and former high-level CPD officials interviewed during our investigation."
>
> b.     "[A]ttempts to hold officers accountable are also frustrated by police officers' code of silence. The City, police officers, and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence."

95.     In April 2016, as part of her duties as chair of the mayor's Police Accountability Task Force, current-Mayor of Chicago Lori Lightfoot concluded: "[T]he code of silence is not just an unwritten rule, or an unfortunate element of police culture past and present. The code of silence is institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City."

96.     In January 2020, Chicago's Interim Police Superintendent Charlie Beck explicitly acknowledged a code of silence in the CPD, noting that "of course" there is such a code in the CPD.

97.     In October 2020, Chicago's Police Superintendent David Brown again acknowledged a code of silence in the CPD, conceding that there is a valid criticism of "this big culture of protecting each other" and that the criticism of the culture is "accurate."

98.     The Code of Silence was active and at work in Defendant Officers' handling of Riddle's traffic stop and arrest in multiple ways, including but not limited to:

> a.     Causing Defendant Officers to manufacture probable cause for a

traffic stop where none existed;

b.    Causing Defendant Officers to use excessive force without fear of rebuke or consequence;

c.    Causing Defendant Officers to completely omit multiple carotid holds from arrest and incident reports;

d.    Causing Defendant Officers to omit Sergeant Schultz from arrest and incident reports despite his playing a central role in the excessive force against Riddle;

e.    Causing CPD's failure to provide dash camera footage to multiple attorneys in response to a subpoena and FOIA requests.

99.    The City of Chicago has failed to discipline Chicago officers and institute adequate disciplinary systems.

100.    The DOJ Report noted that CPD's disciplinary mechanisms contained "numerous entrenched, systemic policies and practices that undermine police accountability," and concluded that the City of Chicago's discipline system "lacks integrity" and "does not effectively deter misconduct."

101.    The DOJ Report also noted that police disciplinary investigators rarely "ask probing questions" of police officers when potential misconduct is at issue. This failure to ensure adequate discipline naturally works in tandem with the code of silence to shield officers from accountability and leads to misconduct like the excessive force and failure to intervene alleged here.

102.    Deficiencies in the City of Chicago's disciplinary mechanisms were a principal cause of the numerous unsubstantiated complaints, particularly when coupled with the above-described code of silence that penalizes officers for speaking up when they witness misconduct by a colleague.

103.    At the time Defendant Officers used excessive force against Riddle, the City of Chicago's policymakers knew that CPD's policies and customs for disciplining and controlling its officers were inadequate and caused police misconduct.

104.    Despite this knowledge, policymakers failed to act to remedy these problems.

## COUNT I
**42 U.S.C. § 1983 – Unreasonable Search and Seizure Against All Defendant Officers**

105.    Riddle re-alleges and incorporates the foregoing paragraphs as though fully set forth here.

106.    Riddle drove his car south on S. Ashland Avenue in the rightmost lane. He never changed lanes, made a turn, or otherwise drifted the entire time he was in view of Officers Arce and Estrada.

107.    Officers Arce and Estrada did not have probable cause or reasonable suspicion to conduct the traffic stop. Although Officer Estrada told Riddle that the reason for the stop was because Riddle failed to use a turn signal, Riddle could not have failed to use a turn signal because he was driving straight, in the same lane, and had not changed lanes, turned, or drifted the entire time he was in view of Officers Arce and Estrada. As such, Officers Arce and Estrada could not have reasonably believed that Riddle committed even a minor traffic offense at the moment that they conducted the traffic stop.

108.    Defendant Officers conducted an unreasonable search of Riddle's car at the conclusion of their seizure, causing significant damage to the car.

109.    Defendant Officers were acting pursuant to the customs, policies, practices, and procedures of the CPD.

110.    As a direct and proximate result of Officers Arce and Estrada's conduct in stopping Riddle, Riddle suffered emotional distress, mental anguish, and subsequent severe physical pain, injuries, and financial loss.

111.    As a direct and proximate result of Defendant Officers' destructive and unreasonably invasive search of his car, Riddle suffered economic loss.

WHEREFORE, Riddle respectfully requests that this Court enter judgment in his favor, and against Defendant Officers, for compensatory damages, punitive damages, attorney's fees and costs, and such other relief as the Court deems just and equitable.

**COUNT II**
**42 U.S.C. § 1983 (Fourth Amendment) – Excessive Force Against Officers Arce, Estrada, and Perez, Sergeant Schultz, and the Unknown Officers**

112.     Riddle re-alleges and incorporates the foregoing paragraphs as though fully set forth here.

113.     Officers Arce, Estrada, and Perez yanked Riddle from his car and shoved Riddle to the ground, causing Riddle's head to slam against the pavement despite the fact that Riddle was unarmed, posed no threat to Defendant Officers, did not actively resist Defendant Officers, and did not attempt to flee.

114.     Officers Estrada and Perez applied a carotid hold after Riddle's head slammed against the pavement despite the fact that Riddle was unarmed, posed no threat to Defendant Officers, did not actively resist Defendant Officers, and did not attempt to flee.

115.     Officer Estrada jerked Riddle's left arm up Riddle's back, causing severe shoulder pain and injury, even though Riddle was already incapacitated by a carotid hold and handcuffs on his right wrist.

116.     Officers Arce, Estrada, and Perez, and Sergeant Schultz, contorted Riddle's body into a modified fetal position despite the fact that Riddle was unarmed, posed no threat to Defendant Officers, did not actively resist Defendant Officers, and did not attempt to flee.

117.     Sergeant Schultz used his arm and hand to choke Riddle, then kneeled with his full body weight on Riddle's neck for close to one minute despite the fact that Riddle was unarmed, posed no threat to Defendant Officers, did not actively resist Defendant Officers, and did not

attempt to flee.

118.    The actions of Officers Arce, Estrada, and Perez, and Sergeant Schultz constituted unreasonable and excessive force in violation of the Fourth Amendment.

119.    At the police station, the Unknown Officers mocked Riddle's injuries, handcuffed Riddle too tightly, and, after Riddle complained about the too-tight handcuffs and asked for a wheelchair, dragged Riddle by his arms out of the holding cell rather than calling for a wheelchair, thereby tightening the handcuffs and otherwise exacerbating his injuries.

120.    The actions of Officers Arce, Estrada, and Perez, Sergeant Schultz, and the Unknown Officers directly and proximately caused Riddle's injuries, including severe physical pain, suffering, humiliation, emotional distress, mental anguish, and financial loss.

121.    The misconduct described in this Count was willful and wanton and undertaken with malice, willfulness, and reckless indifference and conscious disregard for Riddle's rights and safety.

122.    Defendant Officers were acting pursuant to the customs, policies, practices, and procedures of the CPD.

WHEREFORE, Riddle respectfully requests that this Court enter judgment in his favor, and against Officers Arce, Estrada, and Perez, Sergeant Schultz, and the Unknown Officers for compensatory damages, punitive damages, attorney's fees and costs, and such other relief as the Court deems just and equitable.

## <u>COUNT III</u>
**42 U.S.C. § 1983 (Fourth Amendment) – Failure to Intervene Against Officers Glueclich, Jarzabek, Pang, Perez, and Spizzirri, Sergeant Schultz, and the Unknown Officers**

123.    Riddle re-alleges and incorporates the foregoing paragraphs as though fully set

forth here.

124.     Officer Glueclich observed Defendant Officers unnecessarily prolonging the handcuffing process while Riddle was screaming in pain and under the weight of Sergeant Schultz's knee.   Officer Glueclich had a reasonable opportunity to intervene and prevent Defendant Officers' use of excessive force against Riddle, but he failed to do so.

125.     Officer Jarzabek witnessed Officers Arce, Estrada, and Perez pull Riddle from his car and slam his head onto the pavement.   She also watched Officers Estrada and Perez apply the initial carotid restraint, and Sergeant Schultz kneel on Riddle's neck for nearly one minute.   Officer Jarzabek had a reasonable opportunity to intervene and prevent Defendant Officers' use of excessive force against Riddle, but she failed to do so.   Instead, Officer Jarzabek turned and walked away after Riddle started screaming in pain.

126.     Officer Pang helped Officers Arce, Estrada, and Perez pull Riddle from his car and slam his head onto the pavement; then, Pang helped Defendant Officers restrain Riddle on the ground.   Officer Pang had a reasonable opportunity to intervene and prevent Defendant Officers' use of excessive force against Riddle, but he failed to do so.

127.     Officer Perez observed Sergeant Schultz kneeling on Riddle's neck and heard Riddle screaming in pain.   Officer Perez had a reasonable opportunity to intervene and prevent Defendant Officers' use of excessive force against Riddle, but he failed to do so.   Instead, Officer Perez mocked Riddle by saying: "Yeah, yeah, yeah.   Yeah, yeah.   Now you wanna scream?   Now you wanna scream?   Now you wanna scream?"

128.     Officer Spizzirri approached the scene as Riddle was screaming for help.   Spizzirri had a clear view of Sergeant Schultz applying a knee-to-neck carotid restraint.   Spizzirri had a reasonable opportunity to intervene and prevent Sergeant Schultz's carotid restraint, but he failed

to do so.

129.    Sergeant Schultz witnessed multiple Defendant Officers use excessive force on Riddle, but rather than intervening to stop the use of unlawful force, Schultz escalated the situation by applying his own excessive force on Riddle.

130.    The Unknown Officers witnessed officers mocking Riddle's injuries, handcuffing Riddle too tightly, and dragging Riddle by his arms out of the holding cell, thereby further tightening the handcuffs and exacerbating Riddle's injuries.  The Unknown Officers had a reasonable opportunity to intervene and prevent this use of excessive force, but they failed to do so.

131.    Officers Gluecklich, Jarzabek, Pang, Perez, and Spizzirri, and Sergeant Schultz, and the Unknown Officers failed to intervene to prevent the excessive force inflicted against Riddle; their failure directly and proximately caused Riddle's injuries, including severe physical pain, suffering, humiliation, emotional distress, mental anguish, and financial loss.

132.    The misconduct described in this Count was willful and wanton and undertaken with malice, willfulness, and reckless indifference and conscious disregard for Riddle's rights and safety.

133.    Defendant Officers were acting pursuant to the customs, policies, practices, and procedures of the CPD.

WHEREFORE, Riddle respectfully requests that this Court enter judgment in his favor, and against Officers Gluecklich, Jarzabek, Pang, Perez, and Spizzirri, Sergeant Schultz, and the Unknown Officers for compensatory damages, punitive damages, attorney's fees and costs, and such other relief as the Court deems just and equitable.

<u>**COUNT IV**</u>
**42 U.S.C. § 1983 –** *Monell* **Claim: Failure to Train, Failure to Discipline, and Failure to Address the Code of Silence Against the City of Chicago**

134.    Riddle re-alleges and incorporates the foregoing paragraphs as though fully set forth here.

135.    The actions of Defendant Officers resulted from *de facto* policies, practices, and customs of the City of Chicago, including failing to adequately train and discipline CPD officers, and failing to address the Department's pervasive code of silence.

136.    The City of Chicago has a duty and obligation to train and discipline its officers to prevent them from misusing their authority to violate Constitutional rights.

137.    As described herein, the City of Chicago has customs and practices of failing to adequately train CPD officers on the use of force; failing to discipline CPD officers for past misconduct; and maintaining a "code of silence" with regard to officer misconduct, all of which enable and cause violations of Constitutional rights.

138.    The City of Chicago had actual and constructive notice of this pattern of excessive force by CPD officers due to, among other things, the January 13, 2017 DOJ Report, the excessive force investigations and summary reports by Chicago's Civilian Office of Police Accountability, the 2016 Police Accountability Task Force report, hundreds of lawsuits against the City of Chicago and its officers for use of excessive force that have led to more than a hundred million dollars of payouts, and the federal consent decree entered into in January 2019 requiring systematic reform of the CPD, including reforms of CPD's use of force training.

139.    Despite the City of Chicago's actual and constructive notice of this pattern of excessive force by its officers, the City of Chicago failed to implement adequate use of force training.

140. Despite the City of Chicago's actual and constructive notice of CPD's code of silence, the City of Chicago failed to take any action to eliminate or discourage the code of silence.

141. The City of Chicago's failure to act despite the known consequences of inadequate use of force training and a pervasive code of silence—namely, widespread constitutional violations by CPD officers—constituted deliberate indifference to the rights of persons with whom CPD came into contact.

142. Additionally, Defendant Officers' excessive force against Riddle, and the failure to intervene by specific Defendant Officers named above, were the highly predictable consequences of the City's failure to train, failure to discipline, and failure to eliminate CPD's code of silence. Given the duties of CPD officers—including interacting with individuals who may be fearful or suspicious of CPD due to the Department's decades-long history of excessive force and other misconduct, and therefore may not immediately comply with an officer's instruction—it was obvious that inadequate use of force training, failure to discipline, and a failure to address the code of silence would result in a violation of constitutional rights.

143. The City of Chicago's deliberate indifference to adequately training and disciplining CPD officers, and eliminating CPD's code of silence, enabled and condoned the use of excessive force and the failure to intervene by Defendant Officers.

144. The City's failure to train, failure to discipline, and failure to address CPD's code of silence constitute de facto policies that caused Defendant Officers to use excessive force against Riddle and to fail to intervene to prevent the constitutional violations.

WHEREFORE, pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), Riddle requests judgment against the City of Chicago for an award of compensatory damages, attorney's fees and costs, and such other relief as the Court deems just

and equitable.

<u>**COUNT V**</u>
**42 U.S.C. § 1983 – Conspiracy to Deprive Riddle's Constitutional Rights Against All Defendant Officers**

145.    Riddle re-alleges and incorporates the foregoing paragraphs as though fully set forth here.

146.    Officers Arce and Estrada reached an agreement between themselves to unlawfully seize Riddle as described in Count I, thereby violating his rights under the Fourth Amendment.

147.    Officers Arce, Estrada, and Perez, and Sergeant Schultz reached an agreement among themselves to subject Riddle to excessive force, thereby violating his rights under the Fourth Amendment.

148.    Officers Gluecklich, Jarzabek, Pang, and Spizzirri reached an agreement among themselves to stand by and do nothing while the other officers subjected Riddle to excessive force, thereby violating Riddle's rights under the Fourth Amendment.

149.    Defendant Officers conspired through concerted action to achieve these unlawful purposes through unlawful means.

150.    In furtherance of the conspiracy, Defendant Officers committed overt acts and were willing participants in joint activity.

151.    The misconduct described in this Count was willful and wanton and undertaken with malice, willfulness, and reckless indifference and conscious disregard for the rights and safety of Riddle.

WHEREFORE, Riddle respectfully requests that this Court enter judgment in his favor, and against Defendant Officers, for compensatory damages, punitive damages, attorney's fees and costs, and such other relief as the Court deems just and equitable.

<u>**COUNT VI**</u>
**Indemnity Claim – 745 ILCS 10/9-102 Against the City of Chicago**

152.     Riddle re-alleges and incorporates the foregoing paragraphs as though fully set forth here.

153.     The City of Chicago employs Defendant Officers.

154.     Defendant Officers committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Chicago.

155.     In Illinois, public entities must pay for any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.  745 ILCS 10/9-102.

156.     As a proximate cause of Defendant Officers' unlawful acts, which occurred within the scope of their employment activities, Riddle suffered physical, economic, and emotional injuries.

WHEREFORE, Riddle respectfully requests that this Court enter a judgment in his favor, and against the City of Chicago, for compensatory damages, reasonable attorney's fees, costs, and such other relief as the Court deems just and equitable.

**JURY DEMAND**

157.     Riddle demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated:  March 23, 2021

> */s/ Mary Rose Alexander*
> Mary Rose Alexander (IL Bar 6205313)
> Katrina L. Robinson (IL Bar 6334603)
> Julia S. Waterhous (IL Bar 6330606)
> LATHAM & WATKINS LLP
> 330 North Wabash Avenue, Suite 2800

Chicago, IL 60611
Telephone: (312) 876-7700
Fax: (312) 993-9767
mary.rose.alexander@lw.com
katrina.robinson@lw.com
julia.waterhous@lw.com

Marcus Curtis (*pro hac vice* forthcoming)
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Fax: (858) 523-5450
marcus.curtis@lw.com

Brittany Shaw (IL Bar 6333347)
Daniel Massoglia (IL Bar 6317393)
Bobby Vanecko (Law student licensed
under Illinois Supreme Court Rule
711)
First Defense Legal Aid
601 South California Avenue
Chicago, IL 60612
Telephone: (708) 797-3066
brittany@first-defense.org
daniel@first-defense.org
bobby@first-defense.org

*Attorneys for Plaintiff*